CITY OF ST. LOUIS, Trustee Under Will of BRYAN MULLANPHY, v. FRANK W. McALLISTER, Attorney-General, and CHAMBERS SMITH et al., Interveners, Appellants.

In Banc, January 26, 1920.

1. **TRUST FUND: Failure of Objects: Cy Pres Doctrine.** Whether or not there has been a failure or a partial failure of the definite charitable objects for which a trust fund was created is a question of fact to be determined by evidence; and unless the evidence shows with reasonable certainty that there will be a permanent failure of at least a substantial portion of the objects of the trust, the question of further administration and disposition of the fund does not arise, nor can questions of what might be done with the fund were there a failure of the charitable objects be considered.

2. ——: **Reinvestment.** The power of a court of equity to authorize the alienation of property belonging to a charitable trust should be exercised with caution, and should not be exercised at all unless it clearly appears that the proposed alienation would be for the benefit of the charity. So that where the trust fund consists of many tracts of real estate, and the estimates of the price at which it could be sold are one-half its value, and there is no evidence that if sold and the proceeds invested in Government or State bonds the income would amount to as large a net return as is now realized, a decree ordering all the real estate sold and the proceeds invested in bonds should not be rendered.

Appeal from St. Louis City Circuit Court.—*Hon. Thomas C. Hennings, Judge.*

REVERSED AND REMANDED (*with directions*).

*Frank W. McAllister,* Attorney-General, and *S. E. Skelley,* Assistant Attorney-General, for appellant.

(1) The judgment and decree of the court is against the evidence and weight of the evidence. (2) The court erred in its fourth finding of fact that expenditures out of proportion to benefits conferred have been and are necessary because of the poor location and dilapidated condition of the real estate belonging to the fund. (3) The total net income of the trust estate can be applied for the specific purposes designated by the testator. (4) The case made by plaintiff does not sustain the judgment and decree of the court, diverting a portion of the income of the trust estate *cy pres.* (a) The *cy pres* doctrine is one of judicial construction, invoked in order to effectuate the paramount purpose of the founder. 11 C. J. 360; 2 Perry on Trusts and Trustees (6 Ed.), sec. 728; Mo. Historical Society v. Academy of Science, 94 Mo. 467.; Crow ex rel. v. Clay County, 196 Mo. 279; Catron v. Scarritt, 264 Mo. 713. (b) The *cy pres* doctrine is a rule of limitation and in applying same, the court, in the exercise of its equity powers and jurisdiction, can give effect only to the express charitable purposes and intent of the donor, as disclosed by the instrument presented for construction. Crow ex rel. v. Clay County, 196

Mo. 272, 278; Jackson v. Phillips, 14 Allen (Mass.) 591. (c) It is a prerequisite to the application of the doctrine that the court discover a general charitable intent. 11 C. J. 361; Quimby v. Quimby, 175 Ill. App. 372; Allen v. Trustees Nasson's Institute, 107 Me. 120; Bragg v. Litchfield, 212 Mass. 148; Teele v. Bishop of Derby, 168 Mass. 341; Richardson v. Mullery, 200 Mass. 545; Mason v. Library Assn., 237 Ill. 442; Nichols v. Newark Hospital, 77 N. J. Eq. 130. (d) A court of equity may vary the details of administration to effectuate the paramount purpose of the founder, but will not alter the charity itself, or substitute another for it. Lackland v. Walker, 151 Mo. 248; Crow ex rel. v. Clay County, 196 Mo. 279; Hadley v. Forsee, 203 Mo. 428; Catron v. Scarritt, 264 Mo. 729. (e) The decree of the court that the income from the trust fund, beyond what may be necessary to properly provide for the persons designated by the testator, shall be used for the purpose of furnishing relief, information, advice and assistance, to worthy emigrants and travelers, generally, in the City of St. Louis, in need and distress, preference at all times to be given to men with families, and women and children coming within the designation aforesaid, alters the scheme of the charity of the founder; in effect established a new charity and exceeds the jurisdiction and power of the court. Crow ex rel. v. Clay County, 196 Mo. 279; Jackson v. Phillips, 14 Allen (Mass.) 591. (f) There can be no application of the American doctrine of the *cy pres* until there has been an entire failure of the object of the charity according to the original interpretation of the intention of the founder, or until it appears impossible to carry out the scheme according to its terms. Crow ex rel. v. Clay County, 196 Mo. 264; Winthrop v. Attorney-General, 128 Mass. 258; Greene v. Blackwell, 35 Atl. (N. J.) 375; Philpott v. St. George's Hospital, 27 Beav. 127. Whether the intention of the founder as originally construed has failed is a question of fact. Women's Christian Assn. v. Kansas City, 147 Mo. 127. The evidence in this case is insufficient to sustain the finding of the court that the object of

the charity has failed by reason of a cessation of emigration. (5) The decree of the court that the parcels of land described in relator's petition be sold and the proceeds be reinvested in bonds is contrary to the evidence, uncalled for, and unjustified under any view of the situation at this time and opposed to the best interests of the trust estate. (a) Whether inherent or statutory, the power of the court to alienate the lands of a charitable trust is properly exercised only when changed conditions and circumstances make such alteration essential to the beneficial administration of the charity. 11 C. J. 353; 5 R. C. L. 363; Smith v. Smith, 118 N. C. 735; Johnson v. Buch, 220 Ill. 226; Grace Church v. Ange, 161 N. C. 314; Jones v. Habersham, 107 U. S. 183; Lackland v. Walker 151 Mo. 269. (b) No principle obtains justifying the sale of lands dedicated to a charitable use at the mere discretion of the court or upon the sole ground that it appears to be advantageous to the estate. Lackland v. Walker, 151 Mo. 268; Crow ex rel. v. Clay County, 196 Mo. 265; Women's Christian Assn. v. Campbell, 147 Mo. 122. (c) The evidence in this case does not show such change of conditions and circumstances as to render a sale of the lands belonging to the trust estate essential to the beneficial adminstration of the charity. Women's Christian Assn. v. Campbell, 147 Mo. 103; Lackland v. Walker, 151 Mo. 210. (6) Lands or other property once having vested in a trustee for charitable purposes cannot be reclaimed by the donor or his heirs. (a) The rule is settled and thoroughly established that where lands have been donated and become vested in a trustee for charitable uses, neither the donor, nor his heirs can ever reclaim them. 11 C. J. 371; Acad. of the Visitation v. Clemens, 50 Mo. 171; Women's Christian Assn. v. Kansas City, 147 Mo. 126; Lackland v. Walker, 151 Mo. 242; Crow ex rel. v. Clay County, 196 Mo. 261; Mount v. Morris, 249 Mo. 147; Sandusky v. Sandusky, 265 Mo. 234; Jackson v. Phillips, 14 Allen (Mass.) 647. (b) Where the particular object of the charitable bequest is in existence at the testator's death,

but ceases to exist at a subsequent time the legacy does not lapse, but the fund having once vested in the charity may be applied *cy pres* by the court. 11 C. J. 363; Mason v. Lbr. Assn., 237 Ill. 442; Hubbard v. Worcester Art. Museum, 194 Mass. 280; Nichols v. Newark Hospital, 71 N. J. Eq. 130. (c) When an estate is devoted to a charitable purpose and the income of the estate subsequently increases, so that it is in excess of the requirements of the charity, there will be no resulting trust in favor of the heirs-at-law of the donor, but the entire revenue will be devoted to the object of the charity. Beach on Trusts and Trustees, sec. 329.

*Morton Jourdan* and *Lee W. Hagerman* for appellant-interveners.

(1) The court erred in the first clause of its judgment and decree in finding that the interveners had no right, title or interest in any of the property, real, personal or mixed, which Bryan Mullanphy gave to the City of St. Louis in trust. (2) Where there is a failure or partial failure of the purposes, uses and objects of the trust so that the trust cannot be carried out, and the performance of it according to the terms of the declaration of trust is impossible, a resulting and constructive trust in favor of the heirs will be decreed. James v. Allen, 3 Mer. 17; Ommaney v. Butcher, T. & R. 260; Fowler v. Garlike, 1 Russ. & M. 232; Williams v. Kershaw, 5 Cl. & F. 111; Harris v. Du Pasquier, 26 L. T. Rep. 289; Leavers v. Clayton, 8 Ch. D. 589; Adye v. Smith, 44 Conn. 60; Chamberlain v. Stearns, 111 Mass. 267; Nichols v. Allen, 130 Mass. 211; Carrick v. Errington, 2 Pere Williams, 361; Collins v. Wakeman, 2 Ves. Jr. 683; Fitch v. Weber, 6 Hare, 145; Flint v. Warren, 16 Sim. 124; Atty-Gen. v. Dean, 24 Beav. 679, 8 H. L. 369; Roper v. Radcliff, 9 Mod. 171; Hopkins v. Hopkins, 1 Atk. 581, 597; Arnold v. Chapman, 1 Ves. 108; Page v. Leapingwell, 18 Ves. 463; Tregonwell v. Sydenham, 3 Dow. 194; Jones v. Mitchell, 1 S. & S. 290; Pilkington v. Boughey, 12 Sims. 114; Turner v. Russell, 10 Hare, 204; Morris v. Owen, W. N. (1875),

134; Huchaby v. Jones, 2 Hawks, 120; Stevens v. Ely, 1 Dev. Eq. 493; Sorrey v. Bright, 1 Dev. & B. Eq. 113; Thompson v. Newlin, 3 Ired. Eq. 338; Lemmond v. Peoples, 6 Ired. Eq. 137.   (3) The law of private trusts is that where there is a surplus, residue or balance, over and above the amount necessary to satisfy the purposes, uses and objects of the trust, a resulting and constructive trust will be decreed in favor of the heirs or next of kin. Ellcock v. Mapp (England, 1851), 3 House of Lords Cases, 492; Cooke v. Guavas, 9 Mod. 187; Culpepper v. Aston, 2 Ch. Ca. 115; Levet v. Needham, 2 Vern. 138; Randall v. Bookey, 2 Vern. 425; City of London v. Garway, 2 Vern. 571; Countess of Bristol v. Hungerford, 2 Vern. 645; Starkey v. Brooks, 1 P. Wms. 390; Kiricke v. Branshey; 2 Eq. Ab. 508, pl. 5; Robinson v. Taylor, 1 Ves. Jr. 44, 2 Bro. C. C. 588; Dean v. Dalton, 2 Bro. C. C. 634; Habergham v. Vincent, 2 Ves. Jr. 204; Halliday v. Hudson, 3 Ves. Jr. 210; White v. Evans, 4 Ves. 21; Mordaunt v. Hussey, 4 Ves. 117; Seyel v. Wood, 10 Ves. 75; Nash v. Smith, 17 Ves. 29; Landham v. Sanford, 17 Ves. 442, 19 Ves. 643; Southouse v. Bate, 2 V. & B. 396; Kellett v. Kellett, 3 Dow. 248; Girard v. Hanbury, 3 Mer. 150; Wollett v. Harris, 5 Mad. 452; Rhodes v. Rudge, 1 Sim. 79; Braddon v. Farrand, 4 Russ. 87; Harris v. Harris, 2 Keen, 646; Muller v. Bowman, 1 Coll. 197; Andrew v. Andrew, 1 Coll. 686; Love v. Gaze, 8 Beav, 472; Meryon v. Collett, 8 Beav. 386; Sanderson's Trust, 3 K. & J. 497; Saltmarch v. Barrett, 3 De G., F. & J. 279, 29 Beav. 474; Barrs v. Fewkes, 2 Hem. & M. 60; Hall v. Waterhouse, W. N. (1867) 11; Bird v. Harris, L. R. 9 Eq. 204; Selter v. Cavanaugh, 1 Dr. & Walsh, 668; Neale v. Hagthrop, 3 Bland, 551; Skellinger v. Skellinger, 3 N. J. L. J. 179. (4) In cases of charitable trusts, when the *cy pres* doctrine is not applicable, where there is a failure or partial failure of the purposes, uses and objects of a charitable trust, or, where there is a surplus, residuum or balance over and above the amount necessary to satisfy and execute the purposes, uses and objects of a charitable trust, a resulting and constructive trust will be decreed

in favor of the heirs or next of kin or the representative of the donor. Morris v. Bishop of Durham, 9 Vesey, 399, 10 Vesey, 521; Owens v. Missionary Society, 14 N. Y. 380; Downing v. Marshall, 23 N. Y. 366; Levy v. Levy, 33 N. Y. 97; Bascom v. Albertson, 34 N. Y. 584; Adams v. Perry, 43 N. Y. 487; White v. Howard, 46 N. Y. 144; Holmes v. Mead, 52 N. Y. 322; Prichard v. Thompson, 95 N. Y. 76; Cottmar v. Grace, 112 N. Y. 299; Read v. Williams, 125 N. Y. 560; Fosdick v. Hempstead, 125 N. Y. 581; Tilden v. Green, 28 N. E. 880; Walsh v. Secretary of State for India, 10 H. L. Cas. 367 (England 1863).; Marsh v. Means, 3 Jur. N. S. 790 (Eng. 1857); Longford v. Gowland, 3 Clifford, 617 (Eng. 1862); Broadbent v. Barrow, 29 Ch. Dis. 560 (Eng. 1853); Chapman v. Brown, 6 Vesey, 404 (Eng. 1801); Yates v. University College, L. R. 7 H. L. 438; Hopkins v. Ellis, 10 Beav. 169; Atty.-Gen. v. Lord Weymouth, Ambler 19 (Eng. 1743). Henshman v. Atty.-Gen., 3 My. & K. 493 (Eng. 1836); West v. Shuttleworth, 2 Myln & Keen, 684; Attorney-General v. Pyle, 1 Atkins, 435; Adams on Equity (5 Am. Ed.) sec. 71; Story on Eq. Jurispr. (11 Ed.), sec. 1182, p. 489; Maught v. Getzendamer, 65 Md. 332; Salyor v. Plaine, 31 Md. 158; Nichols v. Allen, 130 Mass. 211; Fifield v. Van Wyck, 94 Va. 557; Columbian University v. Taylor, 25 App. D. C. 124; Adage v. Smith, 44 Conn. 60; Hopkins v. Grimshaw, 165 U. S. 342; Miller v. Riddle, 227 Ill. 53; People v. Braucher, 258 Ill. 604; Brooks v. Belfast, 90 Me. 318; Quinby v. Quinby, 175 Ill. App. 367; Stratton v. Medical College, 149 Mass. 505; Bullard v. Sherley, 12 L. R. A. 110; Easterbrook v. Tillinghast, 3 Gray (Mass.) 17; Pringle v. Dorsey, 3 S. C. 502; Grundy v. Neal, 147 Ky. 729; Cone v. Wold, 85 Minn. 302.

*Charles H. Daues & E. Paul Griffin* for respondent.

(1) The charitable trust created by the will of Bryan Mullanphy was a valid one with a competent trustee and

beneficiaries who were in existence at the time of his death, and the trust actually vested in the trustee for the benefit of the beneficiaries indicated in the will after the death of Bryan Mullanphy. Chambers v. City of St. Louis, 29 Mo. 543; Robinson et al. v. Crutcher, 209 S. W. 104. (2) The collateral heirs at law of Bryan Mullanphy have no right, title or interest in said fund. The rule is well settled in this State that where lands have been donated and become vested in a trustee for charitable uses, neither the donor nor his heirs can ever reclaim them. 11 C. J. 371; Acad. of the Visitation v. Clemens, 50 Mo. 167, 171; Women's Christian Assn. v. Kansas City, 147 Mo. 126; Lackland v. Walker, 151 Mo. 242; Crow ex rel. v. Clay County, 196 Mo. 261; Mount v. Morris, 249 Mo. 147; Sandusky v. Sandusky, 265 Mo. 234; Jackson v. Phillips, 14 Allen (Mass.) 647; Hand v. St. Louis, 158 Mo. 204. Where the particular object of the charitable bequest is in existence at the testator's death, but ceases to exist at a subsequent time, the legacy does not lapse, but the fund having once vested in the charity may be applied *cy pres* by the court. 11 C. J. 363; Mason v. Bloomington Lbr. Assn., 237 Ill. 442; Hubbard v. Worcester Art Museum, 194 Mass. 280; Nichols v. Newark Hospital, 71 N. J. Eq. 130. (3) The *cy pres* doctrine is universally recognized in Missouri. The Supreme Court of this State has many times so declared. The plan which the circuit court decreed of broadening and enlarging the charity of Bryan Mullanphy in this case was a proper one under the evidence. Chambers v. City of St. Louis, 29 Mo. 543; Academy of the Visitation v. Clemens, 50 Mo. 167; Goode v. McPherson, 51 Mo. 126; Howe v. Wilson, 91 Mo. 45; Missouri Historical Society v. Academy of Science, 94 Mo. 459; Powell v. Hatch, 100 Mo. 592; Barkley v. Donnelly, 112 Mo. 561; Sappington v. School Fund Trustees, 123 Mo. 32; Lackland v. Walker, 151 Mo. 210; Crow ex rel. v. Clay County, 196 Mo. 234; Mott v. Morris, 249 Mo. 137; Catron v. Scarritt Collegiate Institute, 264 Mo. 713; Hand v. St. Louis, 158 Mo. 204. The *cy pres* doctrine

is recognized in other States and by the Supreme Court
of the United States. Jackson v. Phillips, 14 Allen, 571;
American Academy of Science v. Harvard College, 12
Gray, 582; Russell v. Allen, 107 U. S. 163; Church of
Latter Day Saints v. United States, 136 U. S. 1, 140
U. S. 665; Bispham's Prin. of Eq. (9 Ed.) secs. 128-
130, pp. 221-226; Camp v. Presbyterian Society, 173 N.
Y. S. 581; Minot v. Baker, 147 Mass. 348. The *cy pres*
doctrine has always existed and has always been rec-
ognized in England. Moggridge v. Trackwell, 7 Vesey,
36; Bispham's Principles of Equity (9 Ed.), sec. 128,
p. 221; 5 Am. & Eng. Ency. Law (2 Ed.), p. 937; Pome-
roy Eq. Jur. 1523, sec. 1027; Ommanney v. Butcher,
Turn. & Russ. 270; Attorney-General v. Hicks, 3 Brown
C. C. 166; Attorney-General v. Ironmongers, 2 Beav.
313. (4) It was eminently proper for the court, under
the evidence, to decree the sale of the real estate and
provide for the investment of the proceeds in bonds.
Lackland v. Walker, 151 Mo. 210.

WILLIAMS, J.—This is a suit in equity originally
instituted in December, 1916, in the Circuit Court of
the City of St. Louis.

This suit was instituted by the City of St. Louis,
trustee under the will of Bryan Mullanphy, deceased,
as plaintiff, against the Attorney-General of Missouri
(as the representative of the general public in matters
appertaining to the administration of public charities)
as defendant.

The purpose of the suit, as disclosed by the plead-
ings, was to have a court of equity apply the *cy pres*
doctrine to the administration of the trust fund pro-
vided by said will and to have the court authorize a
sale of all the real estate belonging to said trust fund
and that the proceeds from such sales be re-invested
in high class securities.

After the suit was instituted certain collateral kin-
dred of the testator, by leave of court, filed a petition
as interveners. This petition in substance states that

the objects for which the charity was originally created have failed, and prayed that the court decree a resulting or constructive trust in said property in favor of the heirs of said testator.

Trial in the circuit court resulted in a decree in favor of the plaintiff and thereupon the defendant and the interveners duly perfected an appeal.

The will by which the trust fund in question was originally created was as follows:

"I, Bryan Mullanphy, do make and declare the following to be my last will and testament.

"One equal undivided third of all my property, real personal and mixed, I leave to the City of St. Louis in the State of Missouri, in trust to be and constitute a fund to furnish relief to all poor emigrants and travelers coming to St. Louis, on their way bona fide to settle in the West. I do appoint Felix Coste and Peter G. Camden Executors of this my last will and testament, and of any other will or executory devise that I may leave. All and any such document will be found to be olograph, all in my own handwriting. In testimony whereof witness my hand and seal.

"BRYAN MULLANPHY (Seal)

"Witnesses who have all signed in the presence of the testator and each other, and saw the testator sign in the presence of them and each of them.

"ADOLPHUS WISTIZENUS,
"JOHN WOLFE,
"W. M. WARNE,
"C. AUGUST SCHABEL."

Some of the witnesses estimate the present value of said trust estate to be about one million dollars.

We have read the large record in this case and find that a fair summary of the facts is found in the statement made in the brief of the learned Attorney-General. In fact, the statement of facts made by respondent is practically the same as that made by the defendant.

From the statement of facts contained in the brief filed by the Attorney-General, as appellant, we quote as follows:

"The plaintiff introduced in substance and briefly stated the following evidence, material to the issues involved:

"By the will of Bryan Mullanphy, a wealthy and eccentric bachelor living in St. Louis, executed in 1849 and duly probated in 1851 in the Probate Court of the City of St. Louis, real estate to the value of approximately $500,000, consisting of about ninety parcels, was left to the City of St. Louis, as trustee 'to be and constitute a fund to furnish relief to all poor emigrants and travelers coming to St. Louis on their way bona fide to settle in the West.'"

"Collateral heirs of the testator immediately brought suit in partition, claiming the above devise void and asserting title to the entire property. The Circuit Court of the City of St. Louis found against the heirs, held the devise valid, and its judgment was affirmed by the Supreme Court in 1860. Chambers et al. v. City of St. Louis, 29 Mo. 543. The General Assembly by an act approved March 12, 1859, Laws 1859, p. 280, empowered the City of St. Louis to take, as trustee, devises and bequests for charitable purposes.

"The city in 1860 began the administration of the fund, and by charter provisions and ordinance authorized the city to accept the trust and provide a scheme and plan for its administration. Changes in the details of the plan of administration were made in 1876. Article I, Charter of City of St. Louis, 1876; Ordinance No. 10316; also Clause 10, Sec. I, Art. I, and Sec. I, Art. 14, Charter of City of St. Louis, adopted June 30, 1914; Ordinance No. 27808; Ordinance No. 28840.

"The property passing to the City of St. Louis, trustee, under the Mullanphy will consisted of real estate located in the City of St. Louis, in the county adjoining, and a few parcels in other parts of the State of Missouri. About sixty or seventy-five per cent of said property is improved. The greater portion of the improvements on said property was in poor and dilapidated condition.

"A large portion of the income of said property has been applied from year to year in making additions to and repairing improvements, and in building a 'model tenement' in the nature of an apartment house. Large sums have always been necessary for the item of repairs. Within the last five years more than $150,000 have been spent in alterations and repairs, with the result that, with the exception of perhaps one or two parcels, all are in excellent condition. The tenement property is in that portion of the city known as the 'Ghetto,' which is inhabited by poor people. The vacant city property and the farm lands have never produced even a reasonable return on the value thereof. The farm lands are largely unimproved and cannot be rented to advantage. The gross annual income from said property is approximately $42,000.

"By provisions of the charter and ordinances of the City of St. Louis, the fund was originally administered by a board of thirteen members, appointed by the mayor under a ward plan. In 1915 the board of managers was reduced to three members, who are appointed by the mayor and constitute what is known as 'The Board of Commissioners of the Mullanphy Emigrant and Travelers' Relief Fund.' The present board maintains a permanent office at 307 Locust Street in the City of St. Louis, and meets regularly on Monday. The present members of the board are Theo A. Morrey, Pres., Wm. Riley, Vice-Pres., and J. Russack.

"Walter Ermatinger, who has been for nine years employed by the board as assistant secretary and secretary, testified that the records in the office of the board were more or less complete from the foundation of the fund; that during certain periods, practically no records were made or preserved. In 1874 a committee was appointed by the mayor, at the request of the then board of managers of the fund, to investigate and report to the Board of Aldermen their findings, as to the condition and administration of the fund up to said date. The committee's report is set out in full in the evidence. It

is very complete and frankly discloses that during the thirteen years the fund had then been in existence, little attention had evidently been given it by those responsible for its administration. Meetings of the board had been held very irregularly and sometimes at long intervals; no minutes were kept, no rent roll or other complete report of the income that should be returned by said property was ever made up. Much of the property had been allowed to fall in disrepair. The report of the committee concludes with various recommendations concerning the administration of the fund in the future.

"During the interim between 1869 and 1896 the board had a representative whose duty it was to meet the trains coming into St. Louis and endeavor to locate emigrants and travelers who might be entitled to aid from the fund. Between the years of 1894 and 1915 no such representative was employed. In 1915 the present board was appointed and the so-called 'Traveler's Aid Bureau' was established at the Union Station. The Terminal Company furnishes the bureau with an office in the main reception room of the station, which is on the second floor, and when the bureau was opened posted a bulletin calling the attention of its employees to its existence. No special instructions are known to have been given them concerning it, at that time or since. The chief inspector, Mr. Elliott, testified that he had talked to various Terminal employees concerning the work of the bureau when he took charge of the work. Terminal employees give attention only to such emigrants and travelers as apply for relief.

"Mr. Elliott, as chief inspector, has been in charge of the bureau since its establishment. Prior to his appointment he had been for three years in the secret-service department of the Terminal Railroads Association. He is assisted by a woman who is in charge from seven o'clock in the morning until three in the afternoon. It is the duty of these employees to meet all trains entering the Union Station and to look after the welfare of emigrants and travelers who might come

within the class designated as beneficiaries of the fund. Mr. Morrey, president of the board, visits the station frequently in the evening and confers with the employees. Cases are investigated and if applicants appear to be entitled to relief are referred to the board. The board, if the case is found within their jurisdiction, issues the necessary warrant to furnish the aid needed. No money is paid out by any employee except on authority from the board. The travelers-aid workers receive no supervision from the office of the board direct.

"At the present time the board employees a secretary, an assistant secretary, stenographer, two mechanics, a janitor, and a woman who does 'social service work,' in addition to the two inspectors at the Union Station. These employees receive the following salaries: Secretary, $2,400 per annum; assistant secretary $1,800; stenographer, $60 per month; mechanics, $75 and $85 per month; janitor, $60 per month; social-service worker, $80; inspectors, $100 and $60 per month. The members of the board do not receive any salary.

"In 1849, the date of testator's will, and as appears to have been true for a number of years immediately thereafter, a great many foreign emigrants were passing through St. Louis on their way west, particularly to the mining regions. There were no railroads into St. Louis at that time, and emigrants usually came by steamboat from New Orleans; frequently several hundred would land from a single boat. St. Louis was the out-fitting point for such people. At the outbreak of the Civil War and later upon the completion of the Union Pacific Railroad the number and course of travel of foreign emigrants changed. As is shown by plaintiff's Exhibit No. 10, the number of such persons found to be entitled to aid under the Mullanphy Fund and who were aided varied greatly from year to year. The number of such persons has gradually decreased until now there are practically no emigrants or travelers of the class referred to.

"Passenger agents of various railroads, particularly the Wabash, the St. Louis & San Francisco, the C., B. & Q. and the Pennsylvania lines, testified in substance to the same facts with reference to the trend and condition of emigration at the present time. It was the unanimous opinion of these railroad representatives that at the time the testimony was taken, July, 1918, emigration had practically ceased. It appeared from the testimony that during the year 1914 one million two hundred thousand emigrants came to this country; that about one-half of that number landed in New York; that the average number for a few years previous to said date was about one million; that about six per cent of the number landing in New York came to and through St. Louis in 1917. Said  tives were unanimous in their testimony that the European War then being waged was the immediate cause of the cessation of emigration.

"The condition now existing is very abnormal. Said witnesses all stated that no instructions were given their employees at the station with reference to the Mullanphy Fund.

"Said witnesses further testified that emigration traffic over their roads was handled by a pool under Government direction at the point of landing. That a portion of such travel is assigned to each road. On cross-examination each admitted that they had no direct connection with, nor means of knowing, except in a general way, the volume or status of emigrant travel on their respective roads.

"The station master of the Union Station testified that the office of the Travelers-Aid Bureau is on the second floor of the station; that approximately twenty-five per cent of the traveling public goes to the second floor; that very few emigrants or like travelers, ever reach this portion of the station. Two inspectors are in charge of the bureau, a woman being there from seven o'clock in the morning until three in the after- noon, and a man from three o'clock in the afternoon

until eleven at night. It is the duty of said inspectors to meet all trains and look after all emigrants and travelers in distress, offering, after investigation, the aid of the fund to those who are entitled under the provisions of the will.

"Mr. Elliott, chief inspector, in charge of said bureau, testified that he was under the direction of Mr. Morrey, the president of the board, and Mr. Ermatinger, the secretary. Mr. Ermatinger stated that he had nothing whatever to do with the management of the bureau at the Union Station, and that he was not familiar with the plans being followed there in the carrying out of that feature of the administration of the fund. He further testified, however, that as secretary he had entire charge of the fund. He further stated that he did not know what efforts were being made to locate emigrants and did not think that the employees were meeting all trains. Mr. Elliott testified that the woman who assisted him in the work of the bureau was 'supposed' to meet all trains. He testified that the bulk of the traveling public would not see the office of the bureau where located at the station; that the chief inspector in charge of the bureau in effect inspects his own work. Mr. Morrey, president of the board, and Mr. Elliott, chief inspector, testified that Mr. Morrey spent three or four hours of at least four or five evenings each week at the station in the interest of the work.

"Railway employees, practically all from the city passenger department of said roads, testified that no instructions were given to their employees at the station with reference to the existence, or purpose, or operation of the Mullanphy Fund.

"Mr. Clifford, the present station master, testified that since the beginning of the European War emigrant travel had been light; that before the Travelers-Aid Bureau was established cases of distressed emigrants and travelers were referred to the city police; that in only a few instances had such cases been referred to the Mullanphy Board; that he had never sug-

gested to the police to take such persons to the office
of the Mullanphy Board. Mr. Clifford further testified
that he had never discussed with Mr. Elliott, or any one
else, the manner in which the bureau at the station is
conducted. Mr. Clifford testified that he had verbally
called the attention of his employees to the Travelers-
Aid Bureau; that he has under his employ sixty per-
sons,.who come in touch with the traveling public. Wit-
ness further testified that he was in charge of the station
in 1904, and had been employed there between 1894 and
said date; that during such time the board had no
representative at the station in any capacity.

"Mr. Elliott, chief inspector of the Travelers-Aid
Bureau, testified that when employed as a special police-
man at the station, as he had been for a number of years
prior to his appointment by the Mullanphy Board, he
had referred all cases of distressed emigrants and
travelers to the station master; that he now, after in-
vestigation, refers all cases of emigrants who apply
for assistance to Mr. Ermatinger, secretary, and that
he is under the secretary's and president's direction.
He further testified that from May 12, 1916, to April 30,
1917, there were only seventy-four cases of emigrants
locating in the West; that the majority of cases handled
by the bureau require simply the locating of relatives
and addresses for travelers who are strange to the city.

"Plaintiff introduced a number of witnesses repre-
senting various charitable associations, as well as private
citizens interested in charitable work, who testified that
there are constantly within the confines of the City of
St. Louis a class of worthy poor, some of whom might
be considered travelers on their way to locate in various
parts of the United States and not necessarily in the
West, who in their opinion came within the class of
beneficiaries closely allied with the class specifically
designated by testator in his will. Much of the testi-
mony of these witnesses advanced personal theories as
to the interpretation of testator's will and the applica-
tion of the fund, *cy pres.*

"Theodore Hemmelman, Jr., president of the board in 1894, testified that in his opinion for a period of possibly twenty years the trust estate would fare better if the money were invested in securities on the five per cent basis, instead of real estate.  Mr. Morrey and Mr. Russack, members of· the present board, both testified that, in their judgment, the real estate belonging to the fund could not be sold at this time except at a great sacrifice; that the improvements are now in good repair, and with the exceptions of some unimproved parcels is yielding a fair return on the investment, and that it would not be advisable to change the form of investment of the trust estate at this time to United States Bonds, or other securities.  Seventy-five per cent of the property is now revenue producing.  It might not be unwise to sell some parcels in order to be able to improve others.

"No evidence was introduced by or on behalf of the defendant.

"The only evidence introduced by interveners was that showing their relationship to Bryan Mullanphy, deceased."

The decree entered by the court (omitting formal parts and that portion finding the issues generally in favor of plaintiff and against defendant and the interveners) is as follows:

"1. The court finds that the said interveners, certain heirs at law of said testator, Bryan Mullanphy, have no right, title or interest in and to any of the property, real, personal or mixed, which the said Bryan Mullanphy gave to the City of St. Louis in trust, as set out in the plaintiff's petition, and it is therefore ordered, adjudged and decreed that the intervening petition be dismissed and judgment be entered against the said interveners and that it be decreed that they have no right, title or interest whatever in and to the property given by the said Bryan Mullanphy to the City of St. Louis, as trustee, and that there is no equity in their petition filed herein.

"2.   The court finds that plaintiff, City of St. Louis, is the testamentary trustee under the will of Bryan Mullanphy, deceased, as set out in plaintiff's petition, and that by said will said Bryan Mullanphy devised to said trustee one equal undivided third of all his property, real, personal and mixed, in trust, to be and constitute a fund to furnish relief to all poor emigrants and travelers coming to St. Louis on their way, bona fide, to settle in the West; that said city accepted by ordinance the trust so created, on November 6, 1851; that the Supreme Court of Missouri at the March Term thereof, in 1860, affirmed the judgment of the Circuit Court of the City of St. Lous, which assigned one-third of all the real property of which Bryan Mullanphy died seized, to the City of St. Louis, as trustee, under the terms of the trust created by the will, as set forth in the petition; that as soon as said city became possessed of the legal title to said property, as trustee, it began the execution of said trust and has done so since said time and is doing so at present; that said trust is administered by said trustee through the instrumentality of a board consisting of three members, styled 'The Board of Commissioners of the Mullanphy Emigrant and Travelers' Relief Fund.'

"3.   The court finds that in the management of the real estate since the time said trustee became possessed of the legal title thereof up to the present time much of said real estate has been sold or otherwise disposed of, and other real estate has been acquired by said trustee; that some has been exchanged for other lands and considerable has been condemned for public purposes; that at present the real estate possessed by said trust estate and held by said City of St. Louis as trustee is that which is set out and particularly described in plaintiff's petition.

"4.   The court finds that in the management of said estate large expenditures have been and are necessary, which are altogether out of proportion to the sums conferred in benefits, namely, the amounts given to poor

emigrants and travelers coming to St. Louis on their way bona fide to settle in the West; that this has resulted from poor location and dilapidated condition of such real estate, which has required and does require heavy expenditures in the way of repairs, and the rentals arising therefrom are not adequate.

"5. The court finds that the number of emigrants and travelers provided for by the will of said testator is not so large as in former years and is growing smaller, but in the opinion of the court it is not likely to cease altogether; that the total net income of the trust estate is no longer needed for the specific purpose designated by testator; that there are from time to time found within the limits of said City of St. Louis numbers of persons, including travelers, strangers and some emigrants who are helpless and without assistance, who need charitable aid and deserve it, persons who are traveling in various directions other than west, and persons who are traveling west who do not intend to settle there, who become stranded in the City of St Louis and are in need of charitable aid and assistance. And the court doth order and decree that the surplus income, beyond what may be necessary to properly provide for the persons designated by said testator, shall be used for the purpose of furnishing relief to poor emigrants and travelers generally in the City of St. Louis in need and distress, and found to be worthy of assistance; preference at all times to be given to men with families and women and children coming within the designation aforesaid.

"6. The court finds that it will be to the best interest of the estate to sell the parcels of land described in plaintiff's petition, reserving such property as may be required in the administration and necessary to carry out the purposes of the trust. The court does therefore decree, adjudge and empower said City of St. Louis, as trustee, to sell the property belonging to the trust estate, at public or private sale, on such terms as the Board of Estimate and Apportionment of the City of

St. Louis, by order, shall recommend. And the court doth appoint Festus J. Wade, James M. Franciscus and Albert T. Terry commissioners to appraise said property and to sell same, acting in conjunction with and assisting the Comptroller of the City of St. Louis in the manner and on the terms specified. Said commissioners are directed to make a full and complete return of their proceedings for the approval of the court.

"7. Said trustee is authorized, empowered and directed hereafter to invest the proceeds received from the sale of its assets and the surplus income beyond what may be used for the purposes of the trust in bonds of the United States Government, the State of Missouri, or issued by any municipality of the State of Missouri.

"8. The court doth further find that in order to carry out this decree it is necessary that further orders and directions be made from time to time. The court, therefore, retains jurisdiction of this cause for said purpose of making such further orders, decrees and judgments as may seem proper and lawful in the premises; that either said city, or the Attorney-General of the State of Missouri for the time being may have leave hereafter at any time, upon giving the other party fifteen days' notice to that effect in writing, to move the court to make such further orders, decrees and judgments as may be deemed proper and lawful.

"9. The court doth further find that the method of conveying and transferring the title to the property of said trust estate, as particularly set forth in Paragraph Seven of plaintiff's petition, is sufficient in law, and therefore the court doth adjudge and decree that whenever any deeds or other instruments conveying or affecting any part of the real or personal property belonging to said trust, shall have been duly authorized by ordinance by the Mayor and Board of Aldermen of the City of St. Louis, and shall be duly executed and signed by the mayor for the time being of said city, with the common seal of the City of St. Louis impressed thereon, is sufficient in law to convey or otherwise affect all the

right, title and interest to such property vested in said city, trustee as aforesaid, whenever such sale shall be authorized by an order of the court herein.

"10.   Said trustee is directed by the court to hereafter, on the first Monday of June in each year, file with the Clerk of the Circuit Court of the City of St. Louis, for the information of this court, a statement showing the administration of such trust estate.

"11.   The court doth further adjudge and decree that the cost of this proceeding shall be paid by the City of St. Louis, as trustee, from the trust estate under its charge."

Further detailed statement of facts will be made in the course of the opinion.

I.   The legal propositions urged by respondent in attempting to have this trust fund administered *cy pres* and the legal propositions advanced by the interveners in support of their contention that a result-

Failure of Trust Objects. ing or constructive trust in the trust fund should be decreed in favor of the collateral kindred of the donor, are each based upon the hypothesis that there has been a failure, or at least a partial failure, of the objects for which this charitable trust fund was created.   The learned Attorney-General, appellant, however, contends that the court erred in finding, upon the present evidence, such failure had in fact occurred. The first question therefore for determination is: Do the facts shown by the present record justify a court of equity in holding that there has been a failure in whole or in part of the objects for which this trust was founded?   This issue is one of fact.   It will be conceded by all that there has not been a total failure of the objects of this trust, because the evidence clearly shows that up the date of the trial there were poor emigrants and travelers passing through St. Louis to settle bona fide in the West, who come within the express terms of the will.

Has there been a partial failure?   After a careful review of the evidence offered we are of the opinion that

the facts disclosed thereby are not such as will warrant us in answering the above question in the affirmative.

The evidence shows that from 1870 to 1896 the number of persons relieved by this fund averaged approximately 1500 persons annually. For the years 1893, 1894 and 1895, the number thus relieved were 2583, 2120 and 1791 respectively. In the year 1896 the number suddenly dropped to 387. During the years from 1896 to 1915 the number relieved annually ranged from 68 to 411. There appears from the evidence, however, some explanation of the cause of this sudden slump occurring in 1896. From the evidence it appears that prior to 1897 the board in charge of this fund kept representatives at Union Station, whose duty it was to meet incoming trains and hunt up and locate persons coming within the terms of the Mullanphy charity, but that about 1896 this practice was discontinued and *from that date up until the present bureau was established at Union Station in July, 1915,* no one was stationed there whose duty it was to investigate and locate the beneficiaries of this fund.

For the years 1915 and 1916, 142 and 138 persons, respectively have been given relief from this fund, and while it is true that during these two years the bureau had been maintained at Union Station in charge of two employees, yet the further fact remains that in August, 1914, about one year before this bureau was established, the World War began in Europe and that after that time and during the war emigration practically stopped coming to this country.

In other words, the only time during the twenty-two years preceding the trial of this cause when any organized effort was made to keep representatives of this fund at Union Station whose duty it was to meet the traveling public and to discover beneficiaries of this charity, was during the abnormal time of 1915 and 1916 when emigration was practically at a stand-still, and travel of all kinds was more or less affected.

Furthermore, while the effort made by the present board to locate beneficiaries of this fund is very

commendable and appears to be much more than has ever before been done along this line, yet it does not clearly appear from the evidence that all that might be done along this line is even yet being done. The evidence shows that the office of the bureau is located in the west portion of the second floor of the Union Station, and in a portion of the station where the class of persons entitled to relief from this charity seldom go. Neither does it appear that the numbers of employees of this board is sufficient to enable them to find all the persons who might be beneficiaries of the fund.

But even though the evidence showed (which it does not) the exact number of persons annually passing through St. Louis who are entitled to the relief provided, we would still be in the dark as to whether that number was sufficient, when properly administered to by this charity, to absorb the annual net income of this fund. Very little definite information is found in this record as to the net income from this fund. The nearest approach thereto is the testimony of one of the present members of the board, who stated that during the last year the *gross income* from the fund was about $42,000., That from this amount should be deducted $10,000, annually, for city and state taxes, and that from fifteen to twenty thousand dollars should be spent for repairs and betterments in that year, and that there should also be deducted the expense of the clerical help in administering the fund.

Upon the present showing we are not warranted in finding that there has been a failure of the objects of this trust.

What the future may bring forth we have no way of knowing. During the period of reconstruction the movement of emigrants and home-seekers to the West may materially increase. It certainly cannot be foreseen that such will not occur. It was the opinion of some of the traffic men who testified in this case that there would be a great influx of immigration following the war.

4—281 Mo.

Until such time as it can be shown with reasonable certainty that there will be a permanent failure of at least a substantial portion of the objects of this trust the question as to the further administration or disposition of the fund does not arise.

The question therefore as to what might be permitted to be done with the fund if there had been a failure of the trust cannot be properly reached or determined in the present case, and any discussion thereof would rise to no higher standard than mere dictum.

II.    It is further contended that the court erred in ordering the sale of all the real estate of the trust estate and the reinvestment of the fund in high class bonds and securities. We are of the opinion that this point is also well taken.

**Reinvestment.**

Mr. Hemmelman, president of a real estate company and vice-president of a bank, was in 1894 and for about a year and one-half thereafter president of the board having control of this fund. He was the only witness who expressed an opinion in any manner favoring the sale of the property under its present conditions, for the purpose of re-investment in securities. On this point his testimony was as follows: "For a period of twenty years I *presume* the fund would fare better if the money was invested in securities instead of real estate. I believe it would be better if the money were out on a *five per cent* basis." (Italics ours).

Mr. Morrey and Mr. Russack, a majority of the members of the present board in charge of this trust fund, were of the opinion that all of the real estate belonging to the trust estate should not be sold for the purpose of re-investment in Government bonds, etc. Both were of the opinion that it might be for the best to sell off some of the unimproved and non-producing property piece by piece, as the occasion arose and the market would justify, in order to acquire funds with which to improve some of the remaining property, but they were

both of the opinion that it would not be best for the trust estate to make immediate sale of all the property. Mr. Morrey in stating the reason for his opinion testified as follows:

"But you see, your Honor, if you were able to make four per cent net on the property and you tried to sell it, you would be lucky if you could get fifty cents on the dollar, and if you invest that in four per cent securities it is the best you could do, and would be getting two per cent income on the present property. You could not possibly sell it for less than fifty per cent on the dollar, which will bring, say, possibly four per cent, if you sell it at fifty cents on the dollar and invest it in four per cent securities.

"It would not be unwise to give the authority to sell the property in case they should find a fair market and get a fair consideration for the property, it might not be unwise to sell it, but it is hard for me to find a better permanent tangible income than real estate. If you look after it properly it will bring in an income. Where it fails it is the fault of the man who owns it or who manages it. There is a very good example across the street in the Pierce Building. Fourth Street went down, and they said the property was of no account, and here comes a man along and puts up the Pierce Building, and it is to-day possibly one of the best income producing pieces of property in a run-down neighborhood."

There is no showing made in this record as to the condition of the real estate market in St. Louis on this kind of property. The only evidence offered concerning the probable price the property would bring estimates that it would not likely sell for more than one-half its value.

It is impossible to say upon the facts disclosed by the present record that it would be to the benefit of the charity to sell all of the real estate holdings at this time for the purpose of re-investment in State and Federal bonds. There is no evidence from which it might even be inferred that if the property were sold the proceeds

52    SUPREME COURT OF MISSOURI.

Southwest Mo. R. R. Co. v. Pub. Serv. Comm.

therefrom invested in bonds would yield as large a net return as is now realized.

It is well settled that the power of a court of equity to authorize the alienation of property belonging to a charitable trust should be exercised with caution and one of the prerequisites to the exercise of this power is that it shall "clearly appear that the proposed alienation is for the benefit of the charity." [5 R. C. L. 363; 11 C. J. 355; Lackland v. Walker, 151 Mo. 210, l. c. 268.

We therefore conclude that the court erred, on the showing made, in ordering a sale of all the real estate belonging to the trust estate.

From the foregoing it follows that the judgment should be reversed and the cause remanded with directions to dismiss respondent's bill, without prejudice to its right at any time in the future to institute any further proceeding which might become advisable by reason of changed conditions.

It is so ordered. All concur; *Woodson, J.,* in the result.